IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LIGHTSTYLES, LTD, by and through its bankruptcy trustee, LEON P. HALLER,<br>      Plaintiff<br><br>      v.<br><br><br>MARVIN LUMBER AND CEDAR COMPANY, d/b/a MARVIN WINDOWS AND DOORS,<br>      Defendant<br><br>      v.<br><br>ROBERT L. SLAGLE,<br>      Third-party Defendant | CIVIL NO. 1:13-CV-1510<br><br>(Judge Caldwell) |

*M E M O R A N D U M*

I.  *Introduction*

Plaintiff, Leon P. Haller, as the trustee in bankruptcy for LightStyles, LTD ("LightStyles"), filed this lawsuit alleging several causes of action based on the decision of defendant, Marvin Lumber and Cedar Company, /d/b/a Marvin Windows and Doors ("Marvin"), to terminate its business relationship with LightStyles in August 2011. LightStyles was formerly a distributor for Marvin and asserts that Marvin's decision forced it into bankruptcy in June 2012.

Invoking our diversity jurisdiction, 28 U.S.C. § 1332(a)(1), Marvin has counterclaimed against LightStyles and has sued Robert Slagle, LightStyles' principal, as

a third-party defendant, for fraud in the inducement. Marvin claims that in January 2009 LightStyles and Slagle fraudulently induced it to continue the business relationship by misrepresenting LightStyles' financial condition.

We are considering the motion of Slagle and LightStyles for summary judgment on Marvin's fraud claim. The parties agree that Pennsylvania law applies.[1]

II.   *Standard of Review*

Fed. R. Civ. P. 56 governs the grant of summary judgment. The moving party is entitled to summary judgment if he "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). "'Material facts are those that could affect the outcome of the proceeding, and a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party.'" *Roth v. Norfalco LLC*, 651 F.3d 367, 373 (3d Cir. 2011)(quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011))(internal quotation marks omitted).

In pertinent part, parties moving for, or opposing, summary judgment must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The non-moving

---

[1] Marvin has requested oral argument on the motion. We see no need for it.

party cannot rest on mere pleadings or allegations," *El v. Southeastern Pennsylvania Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007), but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). We "must view all evidence and draw all inferences in the light most favorable to the non-moving party," and we will only grant the motion "if no reasonable juror could find for the non-movant." *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008).

In ruling on the motion, we must use the same evidentiary standard that would apply at trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986)("the inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits"); *Northwestern Mut. Life Ins. Co., v. Babayan*, 430 F.3d 121, 129 (3d Cir. 2005). This means that because Marvin must prove its fraud claim by clear and convincing evidence, Slagle and LightStyles can prevail by showing that the evidence in the record is not sufficiently clear and convincing to persuade a reasonable juror that they committed fraud in the inducement. Conversely, Marvin can defeat summary judgment by showing that there is clear and convincing evidence in the record to persuade a reasonable juror that LightStyles and Slagle committed fraud. *See Blaylock v. Allstate Ins. Co.*, No. 06-CV-1456, 2008 WL 80056, at *2 (M.D. Pa. Jan. 7, 2008)(Caldwell, J.).

III.  *Discussion*

Marvin has made the identical claim for fraud in the inducement against LightStyles (in an amended counterclaim) and against Slagle (in a third-party complaint). We recite the claim as it is presented in the amended counterclaim, in relevant part.

Between 1995 and August 2011, Marvin and LightStyles had an oral agreement whereby LightStyles would buy Marvin windows and then sell them to LightStyles' customers, such as retailers and dealers.  (Doc. 33, Am. Counterclaim ¶ 7(a)).

> 13.  On January 5, 2009, LightStyles' largest single customer, Smitty's Building Supply Inc. ("Smitty's"), filed for Chapter 11 bankruptcy protection.
>
> 14.  Slagle informed Marvin that Smitty's owed LightStyles $3.2 million at the time of the bankruptcy and that LightStyles was unsecured for the majority of that debt.
>
> 15.  Marvin was very concerned that LightStyles was not going to recover from such a large loss.
>
> 16.  On January 29, 2009, in an effort to reassure Marvin of the strength of its financial condition, Slagle directed LightStyles' chief financial officer to send Marvin a carefully selected subset of LightStyles' financial records for the period ending November 30, 2008 (the "November Financials").
>
> 17.  In the November Financials, Slagle and LightStyles represented to Marvin that LightStyles had current account receivable assets of $20,783,813.61 and was reserving only $495,142.66 as an allowance for bad debt. Thus, by sending Marvin the November Financials, Slagle effectively represented to Marvin that as of November 30, 2008, LightStyles had $20,298,670.95 in current, collectable accounts receivable.

-4-

>    18. Marvin relied on Slagle's representations regarding
> LightStyles' financial condition and the status of its accounts
> receivable in continuing to sell product to LightStyles from and
> after January 29, 2009 and not terminating its business
> relationship with LightStyles immediately.

(*Id.* ¶¶ 13-18). The January 2009 representation that "LightStyles had more than $20 million in current, collectable accounts receivable as of November 30, 2008," was "false" because at that time LightStyles only had "just over $13 million" in "current accounts receivable." (*Id.* ¶¶ 71-72). The January 2009 representation "was material to Marvin's decision to continue selling" to LightStyles. (*Id.* ¶ 72). Slagle and LightStyles knew at the time of the January 2009 representation that it was false or that it was made recklessly in regard to the truth. (*Id.* ¶ 73). Slagle and LightStyles intended that Marvin rely on the representation, and Marvin justifiably relied on the representation in continuing to deal with LightStyles rather than terminate the relationship, resulting in damage to Marvin. (*Id.* ¶¶ 75 and 77).

> To establish a fraudulent inducement claim under
> Pennsylvania law, Plaintiff must prove the following elements:
>
>    (1) a representation; (2) which is material    to the
> transaction at hand; (3) made falsely, with knowledge of its
> falsity or recklessness as to whether it is true or false; (4) with
> the intent of misleading another into relying on it; (5) justifiable
> reliance on the misrepresentation; and (6) the resulting injury
> was proximately caused by the reliance.

*Harrison v. Cabot Oil & Gas Corp.*, 887 F. Supp. 2d 588, 592 (M.D. Pa. 2012)(quoting *Eigen v. Textron Lycoming Reciprocating Engine Div.*, 874 A. 2d 1179, 1185 (Pa. Super. Ct. 2005))(cases quoted in *Eigen* omitted). Fraud must be proved by clear and

-5-

convincing evidence, *id.*, sometimes referred to as evidence that is "clear, precise and indubitable." *Delahanty v. First Pennsylvania Bank*, 318 Pa. Super. Ct. 90, 109, 464 A.2d 1243, 1252-53 (1983)(internal quotation marks omitted).

### A. *Whether the Representation Was False*

In moving for summary judgment, Slagle and LightStyles first argue that the record does not establish that the January 2009 representation was false. They focus on the November Financials, which consist of LightStyles' income statement and balance sheet as of November 30, 2008. (Doc. 175-1, ECF pp. 28-33). They assert that nothing in the November Financials represents the age of the receivables or whether they were collectable, nor did listing the bad debts represent that the other accounts receivable listed were collectable. Rather, the balance sheet, which lists the accounts receivable, simply, and accurately, totals all of LightStyles' accounts receivable, without any statement as to how old they were or their collectability. Slagle and LightStyles therefore argue that the record fails to support an essential element of Marvin's claim, that there was a false representation.

We reject this argument. First, as Marvin points out, the listing of the accounts receivable as current assets falsely represented that they were collectable. The balance sheet separated the assets into three categories: "Current Assets," "Property and Equipment," and "Other Assets." (Doc. 175-1, ECF p. 32). Under the "Current Assets" category, LightStyles listed accounts receivable in the amount of $20,763,813.61. (*Id.*).

According to the penalty-of-perjury declaration of Elliot Larson, Marvin's chief financial officer from 1992 to 2011:

> Under standard accounting practices, the "Current Assets" category on a balance sheet represents the value of all assets that are reasonably expected to be converted into cash within one year in the normal course of business. Current assets often include cash, accounts receivable, inventory, marketable securities, prepaid expenses and other liquid assets, provided that they are reasonably expected to be converted to cash within one year in the normal course of business.

(Doc. 171, Larson Decl. ¶ 7). Marvin therefore argues that when LightStyles listed accounts receivable under "Current Assets" on the balance sheet, it was representing that the accounts receivable could reasonably be expected to be converted into cash within one year.

Second, as Marvin also points out, after Larson received the November Financials in January 2009, he asked Slagle if the accounts receivable, except for the Smitty's account, were "good receivables." Slagle said that they were. (*Id.* ¶¶ 9 and 11). At his deposition, Larson testified that he asked if the accounts receivable "were okay," meaning as Larson testified, "if he felt they were good . . . ." (Doc. 155-7, ECF p. 17). Slagle "assured [Larson] that they were." (*Id.*). According to Larson: "Under common accounting usage, the phrase 'good receivables' means accounts receivable that are less than 90 days from invoice date and that a party reasonably expects will be converted to cash within one year in the normal course of its business." (*Id.* ¶ 10). Marvin therefore argues that when Slagle said the accounts receivable were "good receivables," he was

-7-

representing that some $15 million of receivables were collectable and that LightStyles had the financial strength to continue as a Marvin distributor.

In their reply brief, Slagle and LightStyles argue that Marvin admitted, through the deposition testimony of Gary Daniels, Marvin's corporate designee under Fed. R. Civ. P. 30(b)(6), that LightStyles never represented that its accounts receivable were current and collectable. They rely on the following exchange at the deposition after Daniels was shown the November Financials:

> Q. . . . In the accounts receivable line which Mr. Larson had some questions about, that doesn't say anything about the aging of accounts receivable? Does it?
>
> A. Not to my knowledge, no.
>
> Q. Okay. It doesn't say whether these are current accounts receivables for example?
>
> A. No.

(Doc. 155-8, ECF p. 13).

We disagree. It is difficult to tell what Daniels is admitting here. It could well be only an admission that there was no affirmative statement on the balance sheet: (1) about the aging of the accounts receivable; or (2) that there were current accounts receivable. In any event, Marvin is not relying on any such statements on the balance sheet but on what "standard accounting practices" indicate about the collectability of accounts receivable that are listed on a balance sheet under current assets.

Slagle and LightStyles next argue in their reply brief that Marvin attempts to defeat summary judgment by submitting the "sham" affidavits of Daniels and Larson. The

sham affidavit doctrine precludes the nonmoving party from defeating summary judgment by relying on the affidavit of a witness which contradicts his earlier deposition testimony. *Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007).  "[N]ot all contradictory affidavits are a sham." *Id.* at 254.  If there is independent evidence in the record corroborating the affidavit, the affidavit will not be disregarded.  *Id.*  Additionally, if the affiant offers a "'satisfactory explanation'" for the contradiction, the affidavit will not be disregarded.  *Id.* (quoted case omitted).

We start with Daniels' affidavit.  The contradictory part appears to be the following:

> 3.  At my deposition, I was asked about whether the "accounts receivable" line on LightStyles November 30, 2008 Balance Sheet stated the age of the receivables.  That specific line does not contain such information.  However, the Balance Sheet does state that LightStyles' listed accounts receivable are "Current Assets."
>
> 4.  I understand that under generally accepted accounting principles, "Current Assets" means assets that can be converted to cash within one year in the ordinary course of business.
>
> 5.  At the time it received the November 30, 2008 Balance Sheet, Marvin believed that the accounts receivable account listed under "Current Assets" contained information that would be consistent with normal accounting practices.  That's why when asked at my deposition if it was Marvin's position that the accounts receivable line was a representation as to the age of the receivables, I responded: "It's simply a listing of accounts receivable by ***whatever normal accounting practices would be*** is the way we look at it."  In other words, Marvin interpreted LightStyles' Balance Sheet as a representation that it had just over $20,000,000 in accounts

>   receivable as of November 30, 2008 that it would be able to
>   collect within the next year.

(Doc. 170, ¶¶ 3-5).

The sham affidavit doctrine does not preclude reliance on the Daniels' affidavit. Paragraph 5 of the affidavit indicates that the affidavit does not contradict his deposition testimony because later in the deposition Daniels asserts he was not a "finance guy," (Doc. 155-8, ECF p. 13), that he had not probed Larson in detail about the November Financials, (*id.*, ECF p. 14), and that the listing of the accounts receivable was by "whatever normal accounting practices" would apply. (*Id.*, ECF p. 15).

We next review the Larson affidavit. Slagle and LightStyles do not specify how his affidavit contradicts his deposition testimony, but they appear to argue that somewhere in his deposition he admitted that "the November Financials, on their face, did not represent that the accounts receivable were 'current' and 'collectable.'" (Doc. 179, Reply Br. at ECF p. 8). We can reject this argument for the same reason we rejected it in connection with Daniels' affidavit, that in any event, Marvin is not relying on any such statements on the balance sheet but on what "standard accounting practices" indicate about the collectability of accounts receivable that are listed on a balance sheet under current assets.

Slagle and LightStyles next argue that Marvin cannot rely on "standard accounting practices." First, they argue that neither Larson nor Daniels have established "they have the requisite training or experience to render what amounts to an expert opinion regarding 'standard accounting practices,' whatever that phrase means," as an

-10-

accounting expert usually testifies based on "Generally Accepted Accounting Practices, or GAAP. (Doc. 179, ECF p. 8).

We reject this argument. As Slagle and LightStyles admit, Larson is a C.P.A. with extensive accounting experience, (Doc. 155-1, ECF p. 9 n.2), so he would have the necessary expertise. Additionally, the accounting terms at issue here, "current assets" and "good receivables," do not appear to be esoteric accounting principles requiring some expert explanation, but rather commonplace accounting terms that a person, like Slagle, running a business, would understand.

Slagle and LightStyles next argue that Marvin improperly attempts to transform Larson's deposition testimony into a statement by Slagle that the receivables were "good receivables," with the meaning that the receivables were less than 90 days from invoice date and that they could reasonably be expected to be converted into cash within one year in the normal course of LightStyles' business. Slagle and LightStyles point out that Larson only testified to asking if the receivables were "okay," if Slagle "felt they were good." Larson did not follow up with other questions concerning how the financial statements were prepared, what they represented, or whether they were prepared in accordance with "standard accounting practices." Nor did Larson explain to Slagle what he meant by receivables that were "okay" or "good." Slagle and LightStyles argue this testimony fails to meet Marvin's burden of showing fraud by clear and convincing evidence.

This argument lacks merit. Since we have accepted that at least Larson can testify to the significance of "current assets" and "good receivables" in the context of this case, his testimony would meet Marvin's burden of proof. The testimony of a single witness is sufficient to establish fraud. *See Delahanty*, *supra*, 318 Pa. Super. Ct. at 111, 464 A.2d at 1253.

We therefore conclude that Slagle and LightStyles are not entitled to summary judgment on the basis that no false representations were made to Marvin.

### B. *Justifiable Reliance*

Slagle and LightStyles argue that Marvin cannot establish justifiable reliance. We provide some background to this argument. As already referenced, on January 5, 2009, Smitty's Building Supplies, a LightStyles' customer, filed for Chapter 11 bankruptcy. (Doc. 155-3, Slagle Decl. ¶ 2). Marvin requested the November Financials "to analyze LightStyles' financial position and determine whether it had the financial strength necessary to continue after Smitty's bankruptcy." (Doc. 171, Larson Decl. ¶ 4). The amount Smitty's owed LightStyles at the time of its bankruptcy was $3.2 million. (Doc. 33, Am. Counterclaim ¶ 14; Doc. 155-7, ECF p. 14, Larson Dep.). The November Financials were not year-end financial statements but statements for the month ending November 30, 2008. (Doc. 175-1, ECF p. 30, November Financials). Larson knew this. (Doc. 155-7, ECF p. 16, Larson Dep.); (Doc. 155-2, Slagle's and LightStyles' Statement of Material Facts ¶ 15 and (Doc. 168) Marvin's response thereto ¶ 15). The balance sheet also contained "significantly large accounts receivable." (Doc. 155-7, ECF pp. 15-

16, Larson Dep.).   After reviewing the November Financials, Larson had a telephone conversation with Slagle.  He did not ask Slagle about the age of the accounts receivable or about the bad debt listed on the balance sheet in the amount of $495,142.  (Doc. 155-7, ECF pp. 17-18).  Larson did "encourage[ ] [Slagle] to start collecting on . . . his receivables."  (Doc. 155-7, ECF pp. 15-16, Larson Dep.).  Larson knew that the bad debt did not include the Smitty's receivables as the statements were dated November 30, 2008.  (Doc. 155-7, ECF pp. 18-19).

       Slagle and LightStyles argue that Marvin could not have justifiably relied on the November Financials because Larson, a C.P.A. and experienced with financial statements, knew that the November Financials were not year-end statements.  This argument lacks merit as the mere fact they were not year-end statements would not have meant they were not accurate.

       Slagle and LightStyles next argue that Marvin could not have justifiably relied on the November Financials as representing that accounts receivable in the amount of $20,763,813.61 were collectable because Larson knew that this amount included the $3.2 million of Smitty's accounts receivable.  This argument lacks merit as Marvin knew to take into account Smitty's bankruptcy, (Doc. 171, Larson Decl. ¶ 16), which still left substantial accounts receivable apparently collectable.  Further, as Marvin points out, there is evidence to support its argument that $5 million of uncollectable Marvin Window & Door Showplace (another company owned by Slagle) receivables were

-13-

fraudulently being counted in the November Financials. (Ex. K, 8-12 § IV.C; Doc. 175-2, ECF pp. 28-29, Hoffman Dep.).

Slagle and LightStyles next argue that Marvin could not have justifiably relied on the November Financials because Marvin admitted that all accounts receivable, not just current ones, would appear in the monthly statements. We disagree. In support of this argument, Slagle and LightStyles rely on Daniels' deposition testimony quoted above. We have already stated why this testimony is not dispositive of the fraud claim, and the analysis applies here as well.

Finally, Slagle and LightStyles argue that Marvin could not have justifiably relied on the November Financials because Larson testified "there were a lot of old receivables" LightStyles had to collect. (Doc. 155-1, ECF p. 12). We disagree. In support of this argument, Slagle and LightStyles rely on Larson's deposition testimony that the balance sheet contained "significantly large accounts receivable." (Doc. 155-7, ECF pp. 15-16, Larson Dep.). They cite no testimony that he knew they were old.

### C. *Whether Slagle or LightStyles Intended to Mislead Marvin into Relying on the November Financials*

Slagle and LightStyles also argue that the record does not establish another element of the fraudulent inducement claim, that Slagle or LightStyles intended to mislead Marvin into relying on the November Financials. In support, they contend Marvin never told them it wanted the November Financials: (1) to decide whether to continue to do business with LightStyles; (2) to determine if LightStyles' accounts receivable were

-14-

current and collectable; or (3) for any express purpose whatsoever.  Since LightStyles did not know the reason why Marvin wanted to see the financials, it could not have intended Marvin to have relied on them.

We disagree.  Duff Marshall, Marvin's vice-president of sales, has affirmed that he called Slagle and asked for the November Financials.  In doing so, he told Slagle that "the reason Marvin wanted to see LightStyles' financials was because it was trying to determine whether LightStyles had the financial strength to continue full operations after Smitty's bankruptcy."  (Doc. 172, Marshall Decl. ¶ 4).  On this view of the evidence, Slagle and LightStyles did know that Marvin wanted to see the financials to evaluate LightStyles' financial condition and therefore did intend for Marvin to rely on them.

Slagle and LightStyles add a new argument in their reply brief, that Marvin cannot assert reliance on the November Financials when it had an opportunity to verify them by asking Slagle specific question about them or by asking for an accounts receivable aging report.  We reject this argument.  Aside from having been raised for the first time in the reply brief, the argument lacks merit.  In the two cases cited in support of it, *Porreco v. Porreco,* 571 Pa. 61, 70-71, 811 A.2d 566, 571-72 (2002), and *Eigen*, *supra*, 874 A.2d 1179, 1189 (Pa. Super. Ct. 2005), verification could have been obtained from third parties.  Here, Slagle and LightStyles argue verification could have been

obtained from them, the alleged tortfeasors.

    We will issue an appropriate order.

                                /s/William W. Caldwell
                                William W. Caldwell
                                United States District Judge

Date: July 6, 2015