IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LIGHTSTYLES, LTD, by and through :
its bankruptcy trustee, LEON P. :
HALLER, : CIVIL NO. 1:13-CV-1510
   Plaintiff :
     :  (Judge Caldwell)
  v.   :
     :
MARVIN LUMBER AND CEDAR :
COMPANY, d/b/a MARVIN :
WINDOWS AND DOORS, :
   Defendant :
     :
  v.   

ROBERT L. SLAGLE,
   Third-party Defendant

*M E M O R A N D U M*

I. *Introduction*

   Plaintiff, Leon P. Haller, as the trustee in bankruptcy for LightStyles, LTD ("LightStyles"), filed this lawsuit alleging several causes of action arising from the decision of defendant, Marvin Lumber and Cedar Company, /d/b/a Marvin Windows and Doors ("Marvin"), to terminate its business relationship with LightStyles in August 2011.

   Marvin is a window and door manufacturer with its principal place of business in Warroad, Minnesota.  LightStyles was the exclusive distributor of Marvin windows for about sixteen years in a territory that could roughly be called the mid-Atlantic region.  LightStyles asserts that Marvin's termination decision forced it into bankruptcy in June 2012.

In its Amended Complaint, LightStyles asserts the following causes of action: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) breach of a franchise agreement; (4) breach of fiduciary duty; (5) unjust enrichment; (6) promissory estoppel; and (7) intentional interference with business and contractual relationships.

We are considering Marvin's motion for summary judgment on all the claims.  The parties agree that Pennsylvania law applies.

II.   *Standard of Review*

Fed. R. Civ. P. 56 governs the grant of summary judgment.  The moving party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a). "'Material facts are those that could affect the outcome of the proceeding, and a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party.'"  *Roth v. Norfalco LLC*, 651 F.3d 367, 373 (3d Cir. 2011)(quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011))(internal quotation marks omitted).

In pertinent part, parties moving for, or opposing, summary judgment must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "The non-moving

party cannot rest on mere pleadings or allegations," *El v. Southeastern Pennsylvania Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007), but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). We "must view all evidence and draw all inferences in the light most favorable to the non-moving party," and we will only grant the motion "if no reasonable juror could find for the non-movant." *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008).

III.  *Discussion*

A.  *The Doctrine of Accord and Satisfaction
     Does Not Defeat LightStyles' Claims*

Citing *Goodway Marketing, Inc. v. Faulkner Advertising Associates, Inc.*, 545 F. Supp. 263 (E.D. Pa. 1982), Marvin moves for summary judgment on all the claims presented in this action on the basis of accord and satisfaction.

> An accord and satisfaction is the result of an agreement between the parties which may be and usually does result from an implied agreement arising from the circumstances. If an agreement stems from a disputed claim, the acceptance of an amount less than the creditor claims to be due, when tendered by the debtor in full satisfaction of the creditor's claim, becomes a completed accord and satisfaction.

*Id.* at 266 (quoted case omitted).

The distribution agreement was terminated on August 15, 2011. (Doc. 150-4, Slagle Decl. ¶ 22; Doc. 150-20, ECF p. 13, Dep. Ex. 8, termination letter). Marvin argues the parties then entered into a "Termination Agreement" that resolved all the claims LightStyles had arising from the termination. As further support, Marvin contends

-3-

that LightStyles made no objection to the "Termination Agreement" and that the parties performed in accord  with that agreement.

The argument is based on an oral agreement supposedly memorialized in two letters.  Robert Slagle, LightStyles' principal, admits an oral agreement was made but, according to him, the agreement dealt only with the transfer of the distributorship to Marvin once Marvin made the decision to terminate LightStyles, not with the release of any legal claims LightStyles might have had for the termination.  (Doc. 150-4, Slagle Decl. ¶ 24).

The first letter is dated August 26, 2011, written on LightStyles' behalf by a lawyer LightStyles retained in the days after the termination.  (Doc. 133, ECF pp. 69-70).  The letter first notes that "the termination will cause LightStyles and its principals significant harm."  (*Id.*, ECF p. 69).  It then expresses a willingness "to cooperate with Marvin in the transition of the distributorship" and to permit Marvin representatives to come to the LightStyles offices on August 29, 2011, provided that Marvin commit in writing to the following conditions.  As set forth in the letter, the conditions were:

> "(1) LightStyles will receive the full compensation of its gross profits . . . for all orders that are currently in place and pending with Marvin."

> "(2) On new orders entered over a period of ninety (90) days, LightStyles will receive five [5%] percent of the invoice price on sales" made in certain territories and by certain dates.

> (3) Marvin will retain LightStyles' service technicians and purchase certain equipment and inventory from LightStyles.

(4) Marvin will purchase certain supplies from LightStyles.

(Doc. 133, ECF pp. 69-70).  LightStyles' attorney closed the letter by stating that these terms were a condition precedent "to LightStyles resolving this matter amicably and permitting [Marvin] to come into their facilities on Monday."  (*Id.*, ECF p. 70).

In a letter dated August 28, 2011, Marvin's in-house counsel responded. The letter initially noted Marvin's agreement that it was "in the best interests of all involved to assist one another in the orderly transition of business" after the termination of the distributorship.  (Doc. 133, ECF p. 75).  It then essentially confirmed the "oral agreements" but also added the following provision: "[N]o other payments or compensation will be due or paid to LightStyles in connection with the termination of the distributorship and related transition arrangements, or for transactions before or after the termination."  (*Id.*).  That letter also stated: "Except as set forth in this letter, there are no agreements between the parties."  (*Id.*, ECF p. 76).

Given our standard of review, we cannot grant summary judgment on the basis of accord and satisfaction.  The oral agreement appears to relate only to the transition of the distributorship from LightStyles to Marvin, or so a reasonable juror could conclude.  The reference in the LightStyles' letter to "resolving this matter amicably" could be to be to the transition.  Additionally, the Marvin letter did not "confirm," as Marvin argues, a complete resolution of the parties' business relationship.  Instead, it added a provision that was not part of the oral agreement, that no other payments or compensation would be due or paid to LightStyles.  Further, the doctrine of accord and

satisfaction requires a "disputed claim," or a "disputed debt," *Goodway Marketing*, 545 F. Supp. at 266, and there is no evidence that at the time these letters were exchanged LightStyles was making any claim that was in dispute with Marvin.

B.  *The Statute of Frauds Bars LightStyles' Breach-of-Contract and Franchise Claims*

LightStyles has made a claim for breach of contract and a claim for breach of a franchise agreement.  In part, in the breach-of-contract claim, LightStyles alleges that Marvin breached the contract by failing to provide LightStyles with Marvin products in a reasonable and timely manner and on reasonable credit terms and by terminating LightStyles' distribution rights without good cause and without reasonable notice.  (Doc. 96-1, Am. Compl. ¶¶ 48 and 50).  In part, the claim for breach of a franchise agreement is that the alleged franchise was terminated in bad faith.  (*Id.* ¶ 61(b)).

Marvin moves for summary judgment on these claims by arguing that they are barred by the statute of frauds, which renders certain oral agreements for the sale of goods unenforceable.

Regardless of their dispute over its terms, the parties agree that their agreement was an oral agreement, not a written one.  (Doc. 137, SMF ¶¶ 17 and 18, and Doc. 150-2, Responding Statement ¶¶ 17 and 18 in which LightStyles states that the agreement was oral).  It was also a distribution agreement whereby Marvin supplied LightStyles with windows to sell in a territory assigned to LightStyles.  (Doc. 137, Marvin's SMF ¶ 1, and Doc. 150-2, LightStyles' Responding Statement ¶ 1); (Doc. 137, SMF ¶ 3,

and Doc. 150-2, LightStyles' Responding Statement ¶ 3); (Doc. 150-4, Slagle Decl. ¶ 9).

The agreement began around late September or early October 1995.  (Doc. 130-4, Slagle

Decl. ¶¶ 7 and 10); (Doc. 131-5, ECF pp. 37-39, Marvin's October 6, 1995, letter).  As

noted above, it was terminated some sixteen years later on August 15, 2011.

Pennsylvania's Uniform Commercial Code has a statute of frauds for the

sale of goods.  In pertinent part, it provides as follows:

> [A] contract for the sale of goods for the price of $500 or more
> is not enforceable by way of action or defense unless there is
> some writing sufficient to indicate that a contract for sale
> has been made between the parties and signed by the party
> against whom enforcement is sought . . . .

13 Pa. Cons. Stat. Ann. § 2201(a).  Distribution and franchise agreements fall within the

scope of this provision.  *Artman v. Int'l Harvester Co.*, 355 F. Supp. 482, 486 (W.D. Pa.

1973).  *See also Stelwagon Mfg. Co. v. Tarmac Roofing Systems, Inc.*, 63 F.3d 1267,

1276 (3d Cir. 1995)(applying the statute of frauds to an oral distribution agreement).

LightStyles does not dispute that section 2201(a) applies here.[1]

Since the agreement was oral, it appears that the statute of frauds would

therefore bar the claims based on breach of contract and breach of the franchise

agreement.  *See L.F. Fairchild, Inc. v. American Express*, 1989 WL 6602, at *4 (E.D. Pa.

Jan. 26, 1989)(oral agreement to sell leather jackets unenforceable under the statute of

frauds); *M. Leff Radio Parts, Inc. v. Mattel, Inc.*, 706 F. Supp. 387, 394 (W.D. Pa.

---

[1]  Hence we have no need to decide if the "dominant purpose" of the agreement is the
sale of goods, *see L.F. Fairchild, Inc. v. American Express*, 1989 WL 6602, at *3 (E.D. Pa.
Jan. 26, 1989), although it seems that this is the case.

1988)(oral agreement that defendant manufacturer would accept return of unsold video games unenforceable under the statute of frauds); *Eastern Dental Corp. v. Isaac Masel Co., Inc.*, 502 F. Supp. 1354, 1365 (E.D. Pa. 1980)(oral requirements contract unenforceable under the statute of frauds); *Artman*, *supra*, 355 F. Supp. at 486 (oral agreement to be a heavy truck dealer unenforceable under the statute of frauds).

In opposition, LightStyles argues that it can enforce the agreement even though it is oral because the purpose of the statute is to prevent fraud that would allow the enforcement of contracts that were never made, not to prevent the enforcement of oral contracts that had in fact been made. *See H.B. Alexander & Son, Inc. v. Miracle Recreation Equip. Co.*, 314 Pa. Super. 1, 6, 460 A.2d 343, 345 (1983)(quoting *Axler v. First Newport Realty Investors*, 279 Pa. Super. 14, 17, 420 A.2d 720, 722 (1980)). LightStyles thus relies upon exceptions to the statute that can allow enforcement of the distributorship agreement despite its oral nature.  As noted by the case Plaintiff cites, *M. Leff Radio Parts, supra,* 706 F. Supp. at 394, the first two exceptions are: (1) the defendant's admission either in its pleadings or testimony that the contract was made; and (2) performance or part performance of the contract on the part of the defendant. The third exception is custom and usage of the trade.  *See H.B. Alexander & Son, supra*, 314 Pa. Super. at 5-6, 460 A.2d at 345; *Stelwagon Mfg. Co. v. Tarmac Roofing Systems, Inc.*, 862 F. Supp. 1361, 1366 (E.D. Pa. 1994), *aff'd in part, rev'd in part, vacated in part, and remanded*, 63 F.3d 1267, 1276 (3d Cir. 1995).  *But see Int'l Poultry Processors, Inc. v. Wampler Foods, Inc.*, 1999 WL 357380, at *2 (E.D. Pa. June 3, 1999)(statute of frauds

-8-

cannot be waived by usage of the trade).  For a fourth exception, LightStyles says certain writings exchanged between the parties satisfies the purpose of the statute of frauds.

LightStyles cannot rely on Marvin's admission that an oral distribution agreement existed to take its claims out of the statute of frauds.  In making this argument, LightStyles does not assert that Marvin admitted that the terms of the agreement were as LightStyles alleges, only that Marvin admitted that an oral agreement existed.  LightStyles' position is that this admission as to the mere existence of the oral agreement permits it to enforce the terms of the agreement as understood by LightStyles.  (Doc. 150, Opp'n Br. at ECF p. 29)("There is no dispute between LightStyles and Marvin that the parties entered into an oral distribution agreement . . . The only dispute is regarding the terms.").

It is true that one exception to the statute of frauds occurs when the defendant admits that the contract was made.  However, in support of this proposition, *M. Leff Radio Parts, supra,* cited *Zlotziver v. Zlotziver*, 355 Pa. 299, 49 A.2d 779 (1946), 706 F. Supp. at 394, a case where, unlike here, there was no issue concerning the terms of the oral agreement.  Further, the case dealt with an oral agreement to transfer land, where proving the agreement requires establishing only certain basic terms.  *See Zuk v. Zuk*, 55 A.3d 102, 110-11 (Pa. Super. Ct. 2012).  Since Marvin has not admitted to the terms of the agreement as alleged by LightStyles, LightStyles cannot rely upon the first exception.

LightStyles next relies on the performance exception to the statute of frauds, as applied in the district court's opinion in *Stelwagon Mfg. Co. v. Tarmac Roofing Systems, Inc.*, 862 F. Supp. 1361, 1366 (E.D. Pa. 1994), and in the Third Circuit's opinion in the same case.  63 F.3d 1267, 1276 (3d Cir. 1995).

In *Stelwagon*, the plaintiff distributor sued the defendant manufacturer for breach of an oral distributorship agreement for "modified asphalt products."  63 F.3d at 1270.  Except for one other distributor, the agreement made the plaintiff the exclusive distributor for the defendant in the Philadelphia, Pennsylvania, area.  *Id.*  The defendant started selling the products to other distributors in the territory.  *Id.*  The plaintiff sued for breach of the agreement.  At trial, there was evidence that, before the breach, the defendant honored the exclusive distributorship agreement by forbidding a Stelwagon competitor from selling in Philadelphia and by not selling to a Stelwagon competitor in Philadelphia.  63 F.3d at 1277.  The jury returned a verdict for the plaintiff.

The defendant raised the statute of frauds in a post-trial motion for judgment as a matter of law, apparently arguing that the performance exception would allow enforcement of the contract, a distributorship agreement contemplating a series of sales, only as to actual performance and not as to any claim for future performance.  The district court rejected this defense, stating:

> [T]he jury was correctly instructed on the performance
> exception to the statute of frauds.  *See* 13 Pa. Cons. Stat.
> Ann. § 2201(c)(3).  Amhaus acknowledged that, as a Tarmac
> vice-president, he enforced the exclusivity provisions of the
> distributorship agreement. . . . The argument that the
> performance exception only excepts the contract to the extent

> of actual performance is not apposite in the context of a distributorship agreement, where the parties are pledging to use their best efforts.  Unlike the sale of discrete goods, upon which Article Two is originally grounded, a distributorship agreement cannot be readily segmented.  Tarmac's conduct indicated the existence of an agreement, and it cannot claim inequity in being held to the full terms of the agreement it entered into.

862 F. Supp. at 1366.

The statute-of-frauds defense was also unsuccessful on appeal.  Citing *W.I. Snyder Corp. v. Caracciolo,* 373 Pa. Super. 486, 541 A.2d 775, 779 (1988), the Third Circuit stated that "Stelwagon's contract claim survives Tarmac's statute of frauds challenge based on the established doctrine that part performance of an indivisible contract will take the whole contract out of the statute of frauds," 63 F.3d at 1276.  The court of appeals continued:

> We agree with the district court's conclusion that Stelwagon's exclusive dealing agreement with Tarmac was indivisible.  Any other conclusion renders Stelwagon and Tarmac's agreement meaningless.  If the contract was divisible by time or by shipments, Tarmac would only have obligated itself to deal exclusively with Stelwagon so long as it chose to do so.  Nor is there any way to limit the agreement by geographic area without doing violence to the jury's conclusion that the exclusive dealing agreement between Tarmac and Stelwagon covered the whole Philadelphia area.  Once Tarmac granted Stelwagon an exclusive distributor contract, albeit orally, and acted on it, that agreement could only be enforced as a whole or not at all.

*Id.* (footnote omitted).

The contract did not have a definite termination date, but the court of appeals stated this did not affect the plaintiff's claim in light of two provisions of the

-11-

Pennsylvania UCC.  First, under 13 Pa. Cons. Stat. Ann. § 2204(c), a contract is enforceable "even if one or more terms are indefinite as long as there is a 'reasonably certain basis for giving an appropriate remedy.'"  63 F.3d at 1276 n.20.  Second, under 13 Pa. Cons. Stat. Ann. § 2309(b), "'Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party.'"  *Id.*  The Third Circuit noted that the defendant had "never argued that it terminated the exclusive dealership arrangement nor that the four-year period of exclusivity by Stelwagon was not reasonable."  *Id.*[2]

LightStyles contends that the district court's analysis in *Stelwagon* of the performance exception to the statute of frauds applies equally here to Marvin's invocation of the defense.  LightStyles maintains that just as the district court in *Stelwagon* rejected the idea that the statute of frauds limited the enforceability of an oral distributorship agreement to actual performance so also we should reject the same defense here given the parties' performance under the distributorship agreement, which for LightStyles and Marvin lasted sixteen years.

This aspect of the district court opinion is distinguishable for the reason given by Marvin.  In *Stelwagon*, the plaintiff was enforcing an oral exclusive distribution agreement and was able to get past the statute of frauds by showing that the defendant

---

[2]  The four-year period appears to be based on the beginning of the agreement in early 1988 until the plaintiff filed suit in February 1992.  63 F.3d at 1271.

itself had enforced the exclusive nature of the agreement.  In the instant case, in contrast, LightStyles has not provided proof of performance by Marvin that would show in some way that the good cause provision for the termination of the oral agreement existed.[3]  Nor has LightStyles pointed us to any proof of performance that would support the existence of any of the other terms of the oral agreement.

Nor is LightStyles assisted by the Third Circuit's analysis of the part performance exception to the statute of frauds.  LightStyles correctly notes that the Third Circuit applied that exception in *Stelwagon* because the distribution agreement there was indivisible.  LightStyles argues that we should do the same here because its agreement with Marvin was also indivisible, relying on the following: (1) the parties performed under the distribution agreement for sixteen years; (2) LightStyles had the exclusive right to sell Marvin windows in its territory (Doc. 150-27, ECF p. 2); LightStyles developed and expanded the market (Doc. 150-4, Slagle Decl. ¶ 14); and (3) LightStyles paid hundreds of millions of dollars to Marvin.  (*Id.*).

We disagree.  The Third Circuit was dealing, as the district court had, with the nature of a distributorship agreement, specifically that it consists of a series of sales to the distributor.  Essentially, the court of appeals decided that the serial nature of these sales did not render the agreement divisible, when accompanied by a term that would make the agreement exclusive.  Importantly, the court also noted that the defendant was

---

[3]  As Marvin notes, LightStyles cannot rely on Slagle's oral testimony that a for-cause provision existed.  *See M. Leff Radio Parts*, *supra*, 706 F. Supp. at 394.

not challenging the duration of the agreement as unreasonable.  The court decided that such an oral agreement, for an exclusive distributorship, was not barred by the statute of frauds, as long as the defendant "acted on it," meaning that the defendant's performance showed that there was an oral agreement that was exclusive for a certain territory.

The instant case is different because LightStyles has not shown that Marvin has recognized by its performance that it entered into a distributorship agreement that could only be terminated for cause.

LightStyles next argues that a third exception applies, that industry custom and practice takes the agreement out of the statute of frauds.  In support, LightStyles contends it has presented evidence that oral agreements are customary in the industry. Custom and usage of the trade can take an oral agreement out of the statute of frauds. *See H.B. Alexander & Son, supra*, 314 Pa. Super. at 5-6, 460 A.2d at 345; *Stelwagon Mfg. Co.*, *supra*, 862 F. Supp. at 1366.  However, LightStyles has not presented any evidence that custom and usage of the trade includes oral agreements that can only be terminated for cause or which contain any of the other alleged contractual terms it is relying on.  At best, LightStyles has only shown that oral agreements are customary in the industry.  (Doc. 150-4, Slagle Decl. ¶ 11).

Finally, LightStyles argues a fourth exception applies, for writings that evidence the agreement.  Specifically, LightStyles relies on its 1995 business proposal;[4]

---

[4]  The business proposal was supposed to be in writing, but no copy has been presented as LightStyles asserts a copy cannot be located.

the October 6, 1995, "confirmation letter" from Marvin; memoranda from Marvin

documenting LightStyles' exclusive territories; and e-mail exchanges between Marvin and

LightStyles regarding the agreement.  LightStyles point us to its Responding Statement

(Doc. 150-2) at ¶¶ 6, 11, 17, 19 for supporting evidence.

We reject this argument.  LightStyles cites no authority to support its

assertion that "writings" are an exception to the statute of frauds.  Further, as Marvin

points out, under 13 Pa. Cons. Stat. Ann. § 2201(a), a "writing" will take an oral

agreement out of the statute of frauds if: (1) the writing is "sufficient to indicate that a

contract for sale has been made between the parties"; and (2) has been "signed by the

party against whom enforcement is sought . . . ."  We do not have the business proposal

before us, and the confirmation letter, while signed by Marvin,  does not indicate an

agreement that can only be terminated for cause or which contains any of the other

alleged contractual terms LightStyles alleges.

We conclude that the statute of frauds bars the breach-of-contract and

franchise claims.

C.  *Even if the Statute of Frauds Did Not Bar the*
     *Claim, LightStyles Has No Claim For Breach*
     *of a Franchise Agreement*

Marvin argues that even if the statute of frauds did not bar the claim,

LightStyles does not have a claim either for breach of contract or for breach of a franchise

agreement.  We will not address this argument in regard to breach of contract but will do

so in regard to a franchise.

-15-

A franchise agreement can exist under Pennsylvania common law.  As described by the Pennsylvania Supreme Court:

> In its simplest terms, a franchise is a license from the owner of a trademark or trade name permitting another to sell a product or service under the name or mark.  More broadly stated, the franchise has evolved into an elaborate agreement by which the franchisee undertakes to conduct a business or sell a product or service in accordance with methods and procedures prescribed by the franchisor, and the franchisor undertakes to assist the franchisee through advertising, promotion and other advisory services.

*Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 374, 390 A.2d 736, 740 (1978)(quoting *Piercing Pagoda, Inc. v. Hoffner*, 465 Pa. 500, 508-09, 351 A.2d 207, 211 (1976)).  The supreme court added: "[T]he cornerstone of a franchise system must be the trademark or trade name of a product.  It is this uniformity of product and control of its quality and distribution which causes the public to turn to franchise stores for the product."  *Id.* at 375, 390 A.2d at 740 (quoting *Susser v. Carvel Corp.*, 206 F. Supp. 636, 640 (S.D.N.Y. 1962)).[5]

LightStyles relies on the following evidence to support its claim that its distribution agreement was a franchise agreement.  First, Slagle's "Business Proposal" described the agreement as "a franchise to sell Marvin windows in several states in the Eastern and Southeastern United States," and in the face of this proposal, Marvin did not tell Slagle it was unwilling to grant a franchise.  (Doc. 150-4, Slagle Decl. ¶¶ 6 and 7).

---

[5]  If a franchise agreement existed, in the absence of a provision allowing termination without cause, Marvin would have to show that the termination was in good faith and commercially reasonable.  *Loos & Dilworth v. Quaker State Oil & Refining Corp.*, 347 Pa. Super. 477, 487, 489, 500 A.2d 1155, 1161, 1162 (1985).

Parenthetically, the court notes that Slagle could not provide a written copy of the

business proposal, but his financial proposal (or plan or forecast) does describe

LightStyles as "the name used to identify a proposed franchise to sell Marvin windows in

several states in the Eastern and Southeastern United States."  (Doc. 150-20, ECF p. 26).

       LightStyles next relies on the following requirements that Marvin allegedly

imposed as part of the agreement:[6]

> 1.  LightStyles had to invest substantial time, effort, and money to develop the market and good will for Marvin products in exclusive territories that were underdeveloped and consisted of small, unprofitable distributors.  (Doc. 150-4, Slagle Decl. ¶¶ 6 and 7).

> 2.  LightStyles' personnel had to travel to Marvin's corporate headquarters in Warroad, Minnesota, for necessary training in Marvin products.  (Doc. 150-4, Slagle Decl. ¶ 9).

> 3.  LightStyles had to bring dealers, architects, and other potential customers to Warroad for marketing purposes. (Doc. 150-4, Slagle Decl. ¶ 11).

> 4.  LightStyles had to provide Marvin with financial statements.

> 5.  LightStyles had to engage in co-op advertising in an amount based on a percentage of LightStyles' annual purchases of Marvin products, irrespective of LightStyles' net profit from the Marvin business.  (Doc. 150-4, Slagle Decl. ¶ 9).

> 6.  LightStyles had to report to and meet with Marvin personnel to provide them with planning information and financial projections, at least annually and informally on a

---

[6]  The court borrows some of LightStyles' language without the use of quotation marks.

quarterly basis, and provide five-year business plans to Marvin.  (Doc. 150-4, Slagle Decl. ¶ 12).

7.  LightStyles had to market Marvin products in the "Marvin way"; i.e., in accordance with methods and procedures prescribed by Marvin.

8.  LightStyles had to comply with Marvin  policies and procedures with respect to ordering Marvin products, delivery times, and customer service.

9.  LightStyles could not sell windows that competed with the Marvin windows it was selling.  (Doc. 150-9, ECF pp. 27-33, Marshall Dep.).

(Doc. 150, Opp'n Br. at ECF pp. 43-46).[7]

Finally, LightStyles relies on certain other aspects of the business

relationship:

1.  Marvin authorized/licensed and urged LightStyles to use Marvin's trademarks and trade name in connection with the distribution business.  (Doc. 150-4, Slagle Decl. ¶ 9).

2.  Marvin assisted LightStyles' business and promotion of Marvin products through Marvin's co-op advertising program . . . and through other advisory services by assigned field and territory representatives.  (Doc. 150-4, Slagle Decl. ¶ 9; Doc. 131-5, ECF pp. 15-16, Morris Dep.).

(Doc. 150, Opp'n Br. at ECF pp. 45-46).

We add the following.  LightStyles operated under its own name.  Its

dealers and other customers bought Marvin windows, but in doing so they dealt with

LightStyles.  (Doc. 150-6, ECF pp. 17-18, Slagle Dep.)(Marvin agreed to sell Marvin

---

[7]  We add here that Slagle also affirms that distributors were required to make factory trips.  (Doc. 150-7, ECF p. 4, Slagle Dep.).

products to LightStyles, and LightStyles agreed to purchase the products for resale to customers like retailers and lumber yards).  Additionally, LightStyles could sell products that did not compete with Marvin windows, and did sell Jeld-Wen doors and Yale hardware.  (Doc. 137, Marvin's SMF ¶ 28, and Doc. 150-2, LightStyles' Responding Statement ¶ 28).  LightStyles not only used the Marvin trademark on its business cards but also its own logo and the logos of Jeld-Wen and Yale.  (Doc. 150-9, ECF pp. 24-26, Marshall Dep.).  LightStyles' stationary said it was a window, door and hardware distributor.  (Doc. 131-3, ECF p. 10, Slagle Dep.).  The LightStyles trucks had LightStyles on the side.  (Doc. 131-5, ECF p. 17, Morris Dep.).  LightStyles' name was on the paychecks; Marvin's was not.  (Doc. 131-5, ECF pp. 17-18, Morris Dep.).

Before December 2009, Marvin's factory representative rarely visited LightStyles facilities and showed little interest in LightStyles' business.  (Doc. 96-1, LightStyles' Am. Compl. ¶ 27; Doc. 131-2, ECF p. 45, Slagle Dep.).  There were the normal annual meetings and other things that had to go on all the time.  Doc. 131-2, ECF p. 45, Slagle Dep.).  LightStyles never paid Marvin a fee called a franchise fee.  (Doc. 150-6, ECF pp. 46-47, Slagle Dep.).[8]  Marvin had no control over LightStyles' hours of operation or whom LightStyles hired.  Doc. 131-2, ECF p. 46, Slagle Dep.).  Marvin had no control over whom LightStyles was selling to, for how much, or what the payment terms were.  (Doc. 131-2, ECF p. 85, Slagle Dep.).

---

[8]  However, Slagle maintains that the fees it did pay made LightStyles a franchise. (Doc. 150-6, ECF pp. 46-47).

In arguing that the agreement was a franchise, LightStyles relies on *Ramuzic*, *supra*.  In that case, the Pennsylvania Supreme Court held that the agreement, ostensibly a three-year lease for a gasoline service station between Atlantic Richfield (Arco) and William Razumic, was really a franchise agreement.  In reaching this conclusion, the court relied on the following provisions of the contract, among others.  First, the agreement limited the use of the premises to that of "a first-class automotive service station" for the stated purpose of obtaining a "fair rental" for Arco.  480 Pa. at 373, 390 A.2d at 739.  Second, the agreement based the rent on the total gallons of gasoline sold per month and required Razumic to submit all information to calculate the rent correctly and to allow Arco to examine his books and records concerning sales of gasoline.  *Id.*, 390 A.2d at 373.  Third, Ramuzic could not change the premises nor any of the signs or trademarks on the premises without Arco's permission.  *Id.*, 390 A.2d at 373.  Fourth, Arco had the right to go on the premises to change its trade name and to paint the premises and to install and replace signs and sign boards.  *Id.* at 374, 390 A.2d at 740.  Fifth, Ramuzic had to operate the service station in a manner that would "reflect favorably" on Arco's goodwill and trademarks.  *Id.* at 374, 390 A.2d at 740.  Sixth, Ramuzic had to operate the station twenty-four hours a day, seven days a week.  *Id.*, 390 A.2d at 374.  The court concluded that the comprehensive terms of the writing meant that Ramuzic "conducted business and sold his products in accordance with methods prescribed by Arco . . . to cause the public to turn to the Arco sign."  *Id.* at 375, 390 A.2d at 740.

The court also relied on Ramuzic's testimony concerning his performance under the agreement, that he regularly spent his own funds on Arco promotions, that he bought his gas from Arco, and had to operate the station twenty-four hours a day, that his employees wore uniforms with Arco insignias at Arco's request and that Arco and Ramuzic co-sponsored a party when a new station for Ramuzic's operations under the lease was opened.  The court said that this evidence of performance indicated Arco's control over the quality of services and products Ramuzic offered and showed that the agreement was a franchise.  *Id.* at 375-76, 390 A.2d at 740-41.

We turn now to LightStyles' argument that the agreement here was a franchise.  Initially, we place no reliance on LightStyles' characterization of the agreement as a franchise;  LightStyles admits it is not conclusive.  Nor do we rely on the failure of Marvin to respond to LightStyles' use of the phrase "proposed franchise."  We look instead, as the Pennsylvania Supreme Court did, to the terms of the agreement and whether it gave Marvin sufficient control over LightStyles' business to qualify as a franchise.

The record is not sufficient to establish the necessary control.  First, LightStyles operated as LightStyles, not under the Marvin name.  Dealers and other customers bought Marvin windows from LightStyles, but in doing so they dealt with LightStyles.  This distinguishes this case from *Ramuzic* even though LightStyles was authorized to use the Marvin trademark and trade name because LightStyles did not identify itself as Marvin.  Second, while LightStyles could not sell windows that competed

with Marvin windows and could not sell Marvin windows outside its assigned territory, it

could, and did, sell other products.  In *Ramuzic*, Ramuzic could only sell Arco products.

Third, LightStyles only had to provide Marvin with financial statements and meet with

Marvin personnel to provide them with planning information and financial projections, at

least annually and informally on a quarterly basis, and to provide five-year business plans

to Marvin.  In *Ramuzic*, on the other hand, Arco's access to Ramuzic's financial

information went deeper; Ramuzic had to submit to Arco all information to calculate the

rent correctly and had to allow Arco to examine his books and records concerning sales

of gasoline.  Fourth, Marvin had almost no involvement with LightStyles' business.  Before

December 2009, Marvin's factory representative rarely visited LightStyles' facilities and

showed little interest in LightStyles' business.  Marvin had no control over LightStyles'

hours of operation or whom LightStyles hired.  Marvin had no control over to whom

LightStyles was selling, the price of the sale, or what the payment terms were.  In

*Ramuzic*, Ramuzic had to operate the station twenty-four hours a day, seven days a week

and could not change the premises nor any of the signs or trademarks on the premises

without Arco's permission; at the same time Arco had the right to go on the premises to

paint them and to install and replace signs and sign boards.  There is no similar evidence

here of Marvin's control of LightStyles' facilities.

   Against these facts, we do not think it significant that LightStyles had to

invest substantial time, effort, and money to develop the market and good will for Marvin

products.  This is part of what a distributor does.  Nor do we think it important that

LightStyles' personnel had to travel to Marvin's corporate headquarters in Warroad, Minnesota, for necessary training in Marvin products; that LightStyles had to bring dealers, architects, and other potential customers to Warroad for marketing purposes; and that LightStyles had to engage in co-op advertising in an amount based on a percentage of LightStyles' annual purchases of Marvin products.

In regard to LightStyles' assertion that it had to market Marvin products the "Marvin way," we could find no evidence in the record of any use of this phrase.  Nor could we find any detail on the "methods and procedures prescribed by Marvin." Similarly, we could find no evidence specifying what LightStyles means by having "to comply with Marvin policies and procedures with respect to ordering Marvin products, delivery times, and customer service."  Finally, Marvin might have assisted LightStyles' business through advisory services by assigned field and territory representatives, but we do not see how this assistance is out of the ordinary for a mere distributorship agreement.

In short, there is insufficient evidence for a reasonable juror to conclude that the agreement between LightStyles and Marvin was a franchise.  *See Witmer v. Exxon Corp.*, 260 Pa. Super. 537, 552, 394 A.2d 1276, 1283-84 (1978)("What is important is the actual control of the lessee's business product limitations, quality controls, hours controls, station inspection all to protect and enhance the good will of the lessor's trademarks."), *aff'd*, 495 Pa. 540, 434 A.2d 1222 (1981).

LightStyles makes one last argument that a franchise agreement existed.  It is based on the Pennsylvania Supreme Court's ruling in *Ramuzic* that Arco could not

terminate the franchise arbitrarily because of the time and effort a franchisee expends in promoting the goodwill of the franchisor.  *Ramuzic*, 480 Pa. at 378, 390 A.2d at 742.  This passage does not bear on the existence of a franchise but on the remedy for a franchisee in the absence of a clause in the agreement dealing with termination.

> D.  *LightStyles has No Claim for Breach of the Implied*
> *Duty of Good Faith and Fair Dealing*

Marvin argues that LightStyles has no claim for breach of the implied covenant of good faith and fair dealing because the claim duplicates LightStyles' breach-of-contract claim.  We agree.

LightStyles' breach-of-contract claim alleges that Marvin undertook the following obligations as part of the oral distribution agreement:

> to supply LightStyles with Marvin products in a timely manner, at reasonable prices, and on reasonable credit terms, not to interfere with LightStyles' business development and growth, not to terminate LightStyles' distribution rights except for good cause and with reasonable notice, and not to withhold unreasonably its consent to a transfer of LightStyles' distribution rights.

(Doc. 96-1, Am. Compl. ¶ 48).  It then alleges:

> Marvin has breached the contract between LightStyles and Marvin in the following ways:
>
> a. Failing to provide LightStyles with Marvin products in a reasonable and timely manner and on reasonable credit terms.
>
> b. Failing to support LightStyles' business development and growth.

c. Terminating LightStyles' distribution rights without good cause and without reasonable notice.

d. Withholding its consent unreasonably to a transfer of LightStyles' distribution rights.

(*Id.* ¶ 50).

LightStyles' claim for breach of the implied covenant of good faith and fair dealing alleges the following breaches by Marvin:

a. Unilaterally imposing restrictive credit terms without prior notice or agreement, knowing that doing so would undermine the parties' agreement, interfere with LightStyles' ability to continue and/or grow its business, and interfere with the parties' prior course of dealings on which the parties' agreement was based and on which LightStyles relied in growing its business.

b. Delaying shipments of Marvin products to LightStyles after orders had been placed unless and until the outstanding orders on a weekly basis amounted to less than Marvin's unilaterally imposed and arbitrary credit limit.

c. Refusing to negotiate in good faith an increase in LightStyles' credit limit based on commercially reasonable factors and accommodations.

d. Refusing to consider in good faith LightStyles' request that Marvin approve a sale of LightStyles' business to Reeb, or another Marvin distributor.

e. Terminating LightStyles' distribution rights without good cause and without reasonable notice, in order to steal LightStyles' distribution network, dealer network, and sales force, which LightStyles had spent more than sixteen years and millions of dollars developing, maintaining, and servicing, and without properly compensating LightStyles for the value of its business.

(*Id.* ¶ 54).

It is readily apparent that the claim for breach of the implied covenant of good faith and fair dealing, although phrased differently, is based on the same allegations made in the breach-of-contract claim.  The claim must therefore be dismissed.  *See Tuno v. NWC Warranty Corp.*, 552 F App'x 140, 144 (3d Cir. 2014)(nonprecedential)(in Pennsylvania, a claim for a breach of the covenant of good faith is subsumed in a breach-of-contract claim so the plaintiff's good faith claim could not stand when it was based on the same allegations that supported the contract claim)(citing *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91-92 (3d Cir. 2000)).  *See also Chanel, Inc. v. The Jupiter Group, Inc.*, No. 04-CV-1540, 2006 WL 1793223, at *6 (M.D. Pa. June 27, 2006)(dismissing a claim for breach of the covenant of good faith based on the same allegations that support the breach-of-contract claim); *King of Prussia Equip. Corp. v. Power Curbers, Inc.,* 158 F. Supp. 2d 463, 466-67 (E.D. Pa. 2001)(granting summary judgment on the claim for breach of the covenant of good faith when it was based on the same actions that support the breach-of-contract claim).[9]

We will therefore grant Marvin summary judgment on LightStyles' claim for breach of the implied covenant of good faith and fair dealing.  Our analysis is the same regardless of whether LightStyles relies on Pennsylvania common law, or the

---

[9] As the Third Circuit noted in *Northview*, *supra*, there are situations where a claim for breach of the covenant of good faith is recognized in Pennsylvania.  One of them is where a franchise relationship exists.  *Northview*, 227 F.3d at 91 (citing *Creeger Brick and Building Supply, Inc. v. Mid–State Bank and Trust Co.*, 385 Pa. Super. 30, 35, 560 A.2d 151, 153-54 (1989)).  As noted above, the parties' agreement was not a franchise relationship.

Pennsylvania UCC at Pa. Cons. Stat. Ann. § 1304 (formerly at Pa. Cons. Stat. Ann. § 1203).  *See Northview Motors*, *supra*, 227 F.3d at 91 n.6.

### E.  *LightStyles Has No Unjust Enrichment Claim*

LightStyles makes a claim for unjust enrichment, alleging that when Marvin terminated the distributorship and took over LightStyles' sales force and dealer network, Marvin was unjustly enriched by the value of the distribution network LightStyles had developed. (Doc. 96-1, Am. Compl. ¶¶ 70-74).  Marvin argues that LightStyles has no unjust enrichment claim because LightStyles acted to advance its own interests or to receive some benefit from the business relationship.  We agree.

Under Pennsylvania law, unjust enrichment has the following elements: "(1) plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) acceptance and retention by the defendant of the benefits, under the circumstances, would make it inequitable for the defendant to retain the benefit without paying for the value of the benefit."  *Commonwealth v. Ortho-McNeill-Janssen Pharm., Inc.*, 52 A.3d 498, 512 (Pa. Commw. Ct. 2012)(internal quotation marks and quoted case omitted).  "[U]njust enrichment will not be found where Plaintiff rendered services to advance its own interests."  *King of Prussia Equip. Corp. v. Power Curbers, Inc.*, 117 F. App'x 173, 176 (3d Cir. 2004)(nonprecedential)(internal quotation marks and quoted cases omitted); *Norris Sales Co., Inc. v. Target Div. of Diamant Boart, Inc.*, No. 01-CV-6793, 2002 WL 31771169, at *4 (E.D. Pa. Dec. 11, 2002)("Courts will not find unjust enrichment where plaintiff has rendered services to advance his own interest.").

Here, LightStyles performed under the distribution agreement to advance its own interest.  It therefore has no claim for unjust enrichment.  *King of Prussia*, *supra*, 117 F. App'x at 176 (terminated distributor's quantum meruit claim based on unjust enrichment and seeking compensation for having built a strong  market share and goodwill was properly rejected when the distributor was acting in its own interest in marketing the manufacturer's product); *Norris Sales Co.*, *supra*, 2002 WL 31771169, at *4 (distributor had no claim for unjust enrichment based on value of terminated distributorship when the plaintiff also profited from creating the distributorship and selling the defendant manufacturer's product).

F.  *LightStyles Cannot Rely on Equitable Estoppel*

In its Amended Complaint, LightStyles makes a claim labeled as one for "promissory estoppel."  LightStyles alleges  that:

> Through Marvin's written and oral communications, conduct, and acts, Marvin represented to LightStyles that if LightStyles invested its time, effort, and capital to establish and develop a sales and distribution network for Marvin's products in LightStyles' Exclusive Territory, Marvin would not terminate LightStyles' distribution rights without good cause and would not deprive LightStyles of obtaining a fair return for the value of its business.

(Doc. 96-1, Am. Compl. ¶ 76).  LightStyles alleges it acted in reliance on these "representations."  (*Id.* ¶ 77).  However, Marvin interfered with LightStyles ability to sell its business by terminating its distribution rights.  (*Id.* ¶ 78).  To enforce Marvin's "promise" LightStyles seeks damages for the fair market value of its business.  (*Id.*).

Marvin moves for summary judgment on this claim in part because promissory estoppel requires an express promise and LightStyles has presented no evidence of an express promise; indeed, by its own admission, the claim is not based on any actual promise by Marvin.

Marvin is correct that in Pennsylvania a promissory estoppel claim requires an express promise. *See C & K Petroleum Products, Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir. 1988); *Luther v. Kia Motors America, Inc.*, 676 F. Supp. 2d 408, 421 n.8 (W.D. Pa. 2009). However, in its opposition brief, LightStyles argues it is presenting an equitable estoppel claim, not one for promissory estoppel. In its reply brief, Marvin argues that LightStyles clearly pled a promissory estoppel claim and it is too late for it to shift to an equitable estoppel claim.

It is true that LightStyles labeled its claim as one for "promissory estoppel," and alleged that Marvin had failed to keep its "promise," but LightStyles also alleged "Marvin's representation was based on "written and oral communications, conduct, and acts . . . " (Doc. 96-1, Am. Compl. ¶ 76), which sounds in equitable estoppel. As stated in *In re Appeal of Cleft of the Rock Ministries*, 2014 WL 2527536, at *4 (Pa. Commw. Ct. 2014)(nonprecedential)(quoted case omitted), "[t]he doctrine of equitable estoppel contains three elements: '1) misleading words, conduct, or silence by the party against whom the estoppel is asserted; 2) unambiguous proof of reasonable reliance upon the misrepresentation by the party asserting the estoppel; and 3) the lack of a duty to inquire on the party asserting the estoppel.'" We will therefore examine the merits of the

equitable estoppel claim.  *See Prusky v. Allstate Life Ins. Co.*, No. 09-CV-5156, 2010 WL 3859787, at *3 n.5 (E.D. Pa. Sept. 30, 2010)(construing claim labeled as an equitable estoppel claim as one for promissory estoppel when elements of the latter were pled in the complaint).

LightStyles argues the claim can proceed under *Straup v. The Times Herald*, 283 Pa. Super. 58, 423 A.2d 713 (1980).  In *Straup*, the Pennsylvania Superior Court held that the plaintiff newspaper distributors could rely on equitable estoppel to enjoin the defendant newspaper from discontinuing the distributorship agreements.  In part, the court relied on the defendant's conduct: (1) in remaining silent when the plaintiffs purchased their distributorships from the previous owners; (2) in not interfering in the operation of the distributorships; and (3) telling one distributor that he should sell the distributorship.  *Id.* at 71-72, 423 A.2d at 720.  The court ruled that the defendant's "words, silence and conduct" indicated that the plaintiffs "were the owners of property which they could sell for value, and not merely parties to daily contracts terminable at will." *Id.* at 72, 423 A.2d at 720.  Since the plaintiffs had established detrimental reliance when they "purchased the distributorships and expended their time and efforts in making the distributorships successful," the defendant was "estopped from claiming that there [was] no ongoing contractual relationship between it and the" plaintiffs.  *Id.*, 423 A.2d at 720.  The superior court concluded that the plaintiffs had a "clear contractual relationships with the newspaper which established a kind of conditional property right in the distributorships that [could not] be terminated at will."  *Id.*, 423 A.2d at 721.  It decided

that an injunction maintaining the relationships was appropriate and that one way the newspaper could terminate the distributorships was to pay the plaintiffs the fair market value of the distributorships.  *Id.* at 73-74, 423 A.2d at 721.

Here, LightStyles argues, just as in *Straup*, that Marvin's representations and omissions induced LightStyles "to enter into the franchise distribution agreement, develop the market for Marvin products, expend time, effort, and money doing so, and continue[ ] its business for sixteen years until wrongfully terminated by Marvin."  (Doc. 150, Opp'n Br. at ECF p. 56).  Accordingly, LightStyles is entitled to the fair market value of its business.

Marvin argues the claim lacks merit because equitable estoppel is not an independent cause of action.  *See Carlson v. Arnot-Ogden Mem'l Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990); *Prusky*, *supra*, 2010 WL 3859787, at *3.  This is true, but equitable estoppel appears to be used here in aid of a contract claim of some sort and therefore appears to be permissible.  *See Bair v. Purcell*, 500 F. Supp. 2d 468, 491 (M.D. Pa. 2007)(equitable estoppel may aid a party in recovering on his legal theory).

Marvin's more significant objection is that in *Kreutzer v. Monterey Herald Co.*, 560 Pa. 600, 747 A.2d 358 (2000), the Pennsylvania Supreme Court overruled *Straup*, stating: "We expressly reject the holding of the Superior Court in the *Straup* case that distributors have 'a kind of conditional property right which could not be terminated at will.'  The distributors have contract rights which may, as stated above, be modified by

subsequent contracts or by conduct or words which would create an estoppel." *Id.* at 607, 747 A.2d at 362.

We agree with Marvin that *Kreutzer* means that LightStyles cannot rely on *Straup*'s reasoning that the conduct of a manufacturer can create "a kind of conditional property right" for which compensation in the form of the fair market value of the distributorship is required.  As noted by the state supreme court in *Kreutzer*, there must be conduct that induced an expectation that the distributor would be compensated for the value of the distributorship if it was terminated.  Here, as Marvin also argues, while LightStyles sets forth its own conduct that supposedly establishes detrimental reliance, it provides no evidence of misleading words, conduct, or silence on the part of Marvin that would induce the belief that Marvin would compensate it for the loss of the distributorship.

G. *LightStyles Has No Fiduciary Duty Claim*

LightStyles has made a claim for breach of fiduciary duty.  It alleges that Marvin breached that duty in the following ways: (1) refusing to continue supplying LightStyles with Marvin products after LightStyles had spent more than sixteen years building and maintaining the market for Marvin products in LightStyles' exclusive territory; (2) terminating LightStyles' distribution rights with no advance notice with the result that LightStyles was unable to keep its business viable by some other means; (3) pirating LightStyles' dealer network and proprietary information relating to its business; and (4)

refusing to allow LightStyles to sell the distribution rights so that LightStyles could salvage some value from its business.  (Doc. 96-1, Am. Compl. ¶ 67).

Marvin moves for summary judgment on this claim for two reasons.  First, LightStyles has no evidence that Marvin owed it a fiduciary duty.  Second, the gist of the action doctrine bars the claim.  We agree with Marvin that LightStyles fails to show it had a fiduciary duty toward it.  We therefore need not examine the argument based on the gist of the action doctrine.

In opposing summary judgment on this claim, LightStyles argues Marvin had a fiduciary duty based on two grounds.  First, Marvin admitted that it and LightStyles were business partners, and under Pennsylvania law partners are in a fiduciary relationship with each other.  *See Rahemtulla v. Hassam*, 539 F. Supp. 2d 755, 778 (M.D. Pa. 2008).

We reject this argument.  LightStyles presents the following evidence to show that the parties were partners.  First, Slagle affirms in his penalty-of-perjury declaration that when the parties entered into their oral distribution agreement, "Marvin reassured [him] that [they] would be business partners and not to worry."  (Doc. 150-4, Slagle Decl. ¶ 7).  Second, Duff Marshall, Marvin's sales manager, testified at his deposition that "we consider all of our distributors and/or dealers to be partners with us, and it is a term we use. . . . you have to have a working relationship. . ."   He further testified that he considers Marvin to be partners even with some builders and architects, that "we are all partners in this . . ."  He stated that you can partner your efforts with

"independent entities," distributors being independent entities, and that's what he's talking about when he talks about "partnering up."  (Doc. 150-9, ECF pp. 7-9, Marshall Dep.).

We agree with Marvin that this evidence is insufficient to establish that Marvin and LightStyles were partners.  To begin with, Slagle's conclusory assertion that Marvin told him they would be business partners is flatly contradicted by LightStyles' own admission, as laid out above, that the parties had an oral distribution agreement, with Marvin the supplier and LightStyles the distributor.  Next, as Marvin points out, "[t]he indispensable requisites of a partnership are the co-ownership of a business and the sharing of profits."  *See Buckl v. Buckl*, 373 Pa. Super. 521, 525, 542 A.2d 65, 67 (1988); *see also Leprino Foods Co. v. Gress Poultry, Inc.*, 379 F. Supp. 2d 650, 655 (M.D. Pa. 2005).  LightStyles has presented no evidence that the parties co-owned a business and shared profits.  Further, Marshall's testimony does not assist LightStyles because he was obviously not talking about being partners in a legal sense.

LightStyles second ground for a fiduciary relationship is that Marvin controlled LightStyles' business as its sole supplier.  As LightStyles also puts it: "Based on the captive business relationship, LightStyles was dependent on Marvin and surrendered substantial control to Marvin over the most important portion of its business; continuing to supply LightStyles with Marvin windows, which amounted to eighty percent (80%) of LightStyles' sales."[10]  (Doc. 150, Opp'n Br. at ECF p. 58).

---

[10]  (Doc. 150-4, Slagle Decl. ¶ 13)("LightStyles' business consisted of approximately eighty percent (80%) Marvin products").

-34-

"Under Pennsylvania law, a fiduciary relationship exists when 'one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side, or weakness, dependence or justifiable trust, on the other." *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 427 F. Supp. 2d 526, 534 (M.D. Pa. 2006)(Caldwell, J.)(quoted cases and internal quotation marks omitted). "[A] business association may be the basis of a confidential relationship only if one party surrenders substantial control over some portion of his affairs to the other." *In re Scott's Estate*, 455 Pa. 429, 433, 316 A.2d 883, 886 (1974); *see also ClinMicro Immunology Ctr., LLC v. PrimeMed, P.C.*, No. 11-CV-2213, 2013 WL 3776264, at *10 (M.D. Pa. July 17, 2013); *Sovereign Bank*, *supra*, 427 F. Supp. 2d at 534; *McDermott v. Party City Corp.*, 11 F. Supp. 2d 612, 626 (E.D. Pa. 1998).

LightStyles' fiduciary argument based on Marvin's control of its business must fail because Marvin did not take control of LightStyles' business. *McDermott*, which LightStyles cites in support of the argument, makes that clear. In that case, the plaintiffs succeeded on a claim of breach of fiduciary duty against the former manager of their store after they showed that they had hired him to manage the store's daily operations and that he controlled almost all the business decisions. 11 F. Supp. 2d at 627. Here, in contrast, the only evidence is that Marvin as the supplier sent its windows to LightStyles as the distributor. Marvin did not take control of LightStyles. *Sovereign Bank*, *supra*, 427 F. Supp. 2d at 534 (retailer's acquisition of bank customers' cardholder information during sales transactions was not taking control of bank's business).

-35-

LightStyles certainly depended on Marvin, but as Marvin argues, a special relationship is not established because Marvin may have had the ability "to shut down" LightStyles "by halting or delaying product shipments."  *Siematic Mobelwerke GMBH & Co. v. Siematic Corp.*, No. 06-CV-5165, 2009 WL 2526436, at *5 (E.D. Pa. Aug. 12, 2009).  Nor does the financially dominant party assume a fiduciary responsibility to the other party.  *Id.* (citing *GNC Franchising, Inc v. O'Brien*, 443 F. Supp. 2d 737, 755 (W.D. Pa. 2006)); *GNC Franchising, Inc v. O'Brien*, 443 F. Supp. 2d 737, 755 (W.D. Pa. 2006)("the mere presence of unequal bargaining power and one-sided contract terms is insufficient grounds" to impose fiduciary responsibility on a franchisor).

## H.  *LightStyles Has No Claim For Intentional Interference With Existing and Prospective Contractual Relationships*

LightStyles has made a claim that Marvin intentionally interfered with existing and prospective contractual relationships with LightStyles' dealers.[11]  LightStyles alleges that, based upon its efforts in building Marvin's recognition in LightStyles' territory, it had developed a network of dealers who consistently submitted purchase orders to LightStyles for Marvin products.  (Doc. 96-1, Am. Compl. ¶ 80).  Because LightStyles had the exclusive distribution rights in the territory, and had a good relationship with its dealers, "but for Marvin's intentional and wrongful interference with LightStyles' business relationships with its dealership network, LightStyles' dealers would have continued to

---

[11]  The claim alleges interference with existing and prospective business relationships as well as with contractual relationships, but we can analyze the claim solely by referring to contractual relationships.

enter into purchase order contracts with LightStyles for Marvin products." (*Id.* ¶ 81).

"Marvin purposely and intentionally interfered" with LightStyles' existing and prospective

contractual relationships "with its dealers . . . by disrupting and delaying shipment of

Marvin products to LightStyles and by terminating LightStyles' distribution rights . . . ." (*Id.*

¶ 82).[12]

Marvin moves for summary judgment on this claim by arguing that

LightStyles has presented no evidence on an essential element of the claim, that Marvin

intended to harm LightStyles by its conduct.  It also argues that the gist of the action

doctrine bars the claim.  We agree with both of these arguments.

> "To set forth a legally sufficient cause of action for
> intentional interference with contractual or prospective
> contractual relations, four elements must be pled: (1) the
> existence of a contractual, or prospective contractual relation
> between the complainant and a third party; (2) purposeful
> action on the part of the defendant, specifically intended to
> harm the existing relation, or to prevent a prospective relation
> from occurring; (3) the absence of privilege or justification on
> the part of the defendant; and (4) the occasioning of actual
> legal damage as a result of the defendant's conduct."
> *Pelagatti v. Cohen,* 370 Pa. Super. 422, 536 A.2d 1337, 1343
> (1987).

*Orange Stones Co. v. City of Reading*, 87 A.3d 1014, 1025 (Pa. Super. Ct. 2014).

---

[12]  The allegation that Marvin disrupted and delayed shipments of Marvin products to
LightStyles refers to Marvin's practice beginning in December 2009 of imposing a credit limit
on LightStyles and not to ship product to LightStyles if LightStyles was over this limit.  This
meant that shipments to LightStyles were often delayed until LightStyles made the necessary
payments.  (Doc. 150-7, ECF pp. 25-26; 31-33; 35-37, Slagle Dep.; Doc. 150-9, ECF pp. 33-
35; 38-39; 42-43, Marshall Dep.; Doc. 150-11, ECF pp. 21-22, Ullman Dep.; Doc. 150-13, ECF
pp. 14-15, Larson Dep.).  Marvin denies that the credit limit began in December 2009, averring
that there always was a limit, but we accept LightStyles' evidence for the purpose of this
motion.

As noted, Marvin's argument is based on the second element.  This element applies whether the claim is interference with existing contractual relationships or prospective contractual relationships.  *See Phillips v. Selig*, 959 A.2d 420, 428 (Pa. Super. Ct. 2008)(setting forth the elements of a claim for interference with prospective contractual relationships and describing the second element as "the purpose or intent to harm the plaintiff by preventing the relation from occurring").  The Pennsylvania Supreme Court has elaborated on the meaning of the second element.  In the context of a claim involving a prospective contractual relationship, the defendant's intent to harm the plaintiff "ordinarily requires conduct intended to interrupt negotiations or prevent the consummation of a contract."  *Glenn v. Point Park College,* 441 Pa. 474, 481, 272 A.2d 895, 899 (1971)(footnote omitted)(quoted treatise omitted); *Orange Stones, supra,* 87 A.3d at 1025.

Marvin argues that it is entitled to summary judgment on this claim by relying on the penalty-of-perjury declaration of Susan Marvin, Marvin's president.  She affirms that she "made the decision to terminate Marvin's distributorship relationship with LightStyles" and that "Marvin did not terminate LightStyles with the intent of harming LightStyles' relationships with current or prospective customers."  (Doc. 130, Susan Marvin Decl. ¶¶ 4 and 5).  Marvin asserts that the claim fails for this reason alone.

We cannot rely on this declaration to reject the claim.  As noted above, the intent-to-harm element requires a plaintiff to show intent to interfere with the existing contract or intent to prevent the prospective contract from being executed.  Ill will on the

part of the defendant is not required.  *University Graphics, Inc. v. Pro-Image Corp.*, 913 F. Supp. 338, 346 (M.D. Pa. 1996)(Caldwell, J.)(citing *Yaindl v. Ingersoll–Rand Co.*, 281 Pa. Super. 560, 581 n.11, 422 A.2d 611, 622 n.11 (1980)).  Thus a bare affirmation that there was no intent to harm is not sufficient.  What is required is evidence showing no intent to cause the consequences of the defendant's conduct.  *See In re Adelphia Communications Corp. Sec. & Derivative Litig.*, No. 05-CV-2770, 2013 WL 6838899, at *12 (S.D.N.Y. Dec. 27, 2013)(applying Pennsylvania law).  Additionally, the declaration does not address the entire claim; it does not address that part asserting tortious interference by disrupting and delaying shipment of Marvin products to LightStyles.

Nonetheless, we will grant summary judgment on this claim as the evidence LightStyles cites to show an intent to harm is insufficient to meet its burden on that element.  LightStyles cites to its statement (Doc. 150-2) responding to Marvin's statement of material fact at paragraphs 48 and 63 and the evidence cited therein.  The cited evidence does not show that Marvin intended to interfere with LightStyles' existing contracts with its dealers or to prevent prospective contracts from being executed.

In relevant part, the evidence shows the following.  When Marvin delayed delivery of product, it negatively impacted LightStyles' business with its dealers.  (Doc. 150-4, Slagle Decl. ¶ 18).  Starting on December 18, 2009, Marvin tightened its credit practices with LightStyles, causing delays in shipments.  (Doc. 150-7, ECF pp. 25-26; 31-33; 35-37, Slagle Dep.).  Before then, LightStyles often had invoices exceeding the amount of its letter of credit.  (Doc. 150-9, ECF pp. 33-35; 38-39; 42-43, Marshall Dep.;

Doc. 150-11, ECF pp. 21-22, Ullman Dep.; Doc. 150-13, ECF pp. 14-15, Larson Dep.).

After Marvin tightened LightStyles' credit, Marvin told Slagle they would work with him on

some projects by sending product to LightStyles' customer directly and getting paid

directly by the customer while providing that LightStyles would still get its profit.  This was

done to keep some of these projects going.  It worked out on a couple of them.  (Doc.

150-15, ECF pp. 2-4, Susan Marvin Dep.).  In an e-mail dated December 11, 2009,

Marvin told Slagle LightStyles' outstanding orders were over $1.5 million and Marvin was

concerned.  (150-25, ECF p. 13, Dep. Ex. 314).

            At some point, Marvin thought to take LightStyles' distributorship dealer

direct.[13]  They did not tell Slagle about it at the time.  However, the first option was to see

him successful.  The second option was to connect him with other distributors.  In a May

4, 2011, e-mail from Marshall, the options were dealer direct, or two distributors, Reeb or

Hastings.  (Doc. 182, ECF pp. 19-24, Susan Marvin Dep.).  In a June 19, 2009, e-mail,

Susan Marvin observed that LightStyles' sales was a "nice chunk of business."  (Doc.

150-32, ECF p. 7, Dep. Ex. 367).  There was also two May 2011 Marvin e-mails seeking

information on LightStyles' dealers.  (Doc. 150-25, p. 18, Dep. Ex. 319).  On May 4, 2011,

Marshall sent an e-mail to Susan Marvin suggesting possible distributors, or going dealer

direct and hiring LightStyles' employees, with the pros and cons of each.  (Doc. 150-25,

---

[13]  "Dealer direct" means that Marvin would sell its windows directly to LightStyles' former customers.  (Doc. 137, Marvin's SMF ¶ 2 and LightStyles' Responding Statement (Doc. 150-2 ¶ 2).

ECF p. 29, Dep. Ex. 320).  In August 2011, e-mails within Marvin showed a list of

LightStyles' dealers and sales to the dealers.  (Doc. 150-33, ECF p. 26, Dep. Ex. 386).

　　　　None of this evidence shows that Marvin's imposition of a credit limit and

resulting delays in shipment was intended to interfere with LightStyles' existing contracts

with its dealers or to prevent prospective contracts from being executed.  Marvin's intent

seems to have been to insure payment from LightStyles, and it engaged in this conduct

for that reason.  In fact, Marvin dealt with some LightStyles' customers directly so that

LightStyles would still receive its expected profit from the transaction.  The evidence also

does not reveal the intent in terminating the distributorship agreement, the other part of

LightStyles' tortious interference claim.

　　　　The tortious interference claim also fails under the gist of the action

doctrine.  In *Bruno v. Erie Ins. Co.*, 106 A.3d 48 (Pa. 2014), the Pennsylvania Supreme

Court recently discussed the doctrine and clarified the analysis to be used when applying

it.  The doctrine bars a tort claim when the gist of the claim is for breach of a contract

between the parties.  *Id.* at 68.  The nature of the duty alleged to be breached, as

supported by factual allegations, is "the critical determinative factor in determining

whether the claim is truly one in tort, or for breach of contract."  *Id.*  As the court stated:

> If the facts of a particular claim establish that the duty
> breached is one created by the parties by the terms of their
> contract — i.e., a specific promise to do something that a
> party would not ordinarily have been obligated to do but for
> the existence of the contract — then the claim is to be viewed
> as one for breach of contract. [citations omitted].  If, however,
> the facts establish that the claim involves the defendant's
> violation of a broader social duty owed to all individuals, which

> is imposed by the law of torts and, hence, exists regardless of
> the contract, then it must be regarded as a tort.  [citations
> omitted].

*Id.* (brackets added).

In the instant case, as noted above, LightStyles made the following breach-of-contract claim.  "Marvin agreed to supply LightStyles with Marvin products in a timely manner, at reasonable prices, and on reasonable credit terms, not to interfere with LightStyles' business development and growth, not to terminate LightStyles' distribution rights except for good cause and with reasonable notice, and not to withhold unreasonably its consent to a transfer of LightStyles' distribution rights."  (Doc. 96-1, Am. Compl. ¶ 48).  Marvin allegedly breached the distribution agreement in the following ways:

> a. Failing to provide LightStyles with Marvin products in a
> reasonable and timely manner and on reasonable credit
> terms.
>
> b. Failing to support LightStyles' business development and
> growth.
>
> c. Terminating LightStyles' distribution rights without good
> cause and without reasonable notice.
>
> d. Withholding its consent unreasonably to a transfer of
> LightStyles' distribution rights.

(*Id.* ¶ 50(a)-(d)).  This is the same conduct upon which the tortious interference claim is based.  In that claim, LightStyles first alleges that Marvin "purposely and intentionally interfered" with LightStyles' existing and prospective contractual relationships "with its dealers . . . by disrupting and delaying shipment of Marvin products to LightStyles and by

-42-

terminating LightStyles' distribution rights . . . ."  (*Id.* ¶ 82).  As explained above, the allegation of disrupted and delayed shipments of Marvin products to LightStyles refers to Marvin's practice beginning in December 2009 to impose a credit limit on LightStyles and not to ship product to LightStyles if LightStyles was over this limit.  LightStyles then alleges in the tortious interference claim that the termination also interfered with LightStyles' existing and prospective contractual relationships.  (*Id.*).

LightStyles does not contend that the claim is based on the breach of a social duty imposed by the law of torts.  The tort claim is based on allegations that support the breach-of-contract claim.  We therefore conclude that, since the tort claim is based upon the breach of a duty created by the terms of the parties' contract, the gist of the action doctrine bars the claim.  *See Bruno*, *supra*, 106 A.3d at 68.

In reaching this conclusion, we recognize that LightStyles argues the gist of the action doctrine does not apply here because Marvin is not a party to the agreements that are the bases of the tortious interference claim, LightStyles' existing and prospective contracts with its dealers.  LightStyles cites in support of this argument *Alpart v. General Land Partners, Inc.*, 574 F. Supp. 2d 491 (E.D. Pa. 2008).  It is true that in *Alpart* the district court ruled on a motion to dismiss that the gist of the action doctrine did not bar a tortious interference claim against certain defendants because the defendants were not parties to the agreement that the plaintiff claimed they had interfered with.  574 F. Supp.

2d at 506.[14]  The court reasoned that because they were not parties to the agreement, they could not have breached the agreement.  *Id.*  It followed that "the claims for tortious interference with contract may be separate and distinct from the breach of contract claims," *id.*, and the motion to dismiss the tortious interference claim based on the gist of the action doctrine was rejected.  *Id.*

We decline to rely on *Alpart*.  That case involved alleged improprieties in agreements involving the development of real estate and is factually distinguishable from the instant case.  It is also not apparent from the opinion the conduct of the defendants that was the basis of the tortious interference claim.  By the court's use of the word "may," it also seems that its decision might have changed as the litigation progressed.  Further, under the gist of the action doctrine, we must look to the facts of a particular claim. *Bruno*, 106 A.3d at 68.  Here, LightStyles alleges, and attempts to prove, a tortious interference claim based solely on allegations that also support its breach-of-contract claim against Marvin.  The gist of the action doctrine bars such a claim.

We buttress this conclusion with *Chemtech Int'l, Inc. v. Chemical Injection Technologies, Inc.*, 170 F. App'x 805 (3d Cir. 2006)(nonprecedential), a case cited by Marvin.  *Chemtech* dealt with a factual setting similar to the instant case.  A distributor sued a manufacturer, making a breach-of-contract claim that the manufacturer was selling its product in violation of an exclusive distribution agreement it had with the

---

[14]  There were two agreements in *Alpart* that were the subject of two tortious interference claims but the same reasoning applied to both.

manufacturer.  The distributor also made tortious interference claims, alleging that the

manufacturer's sales to the distributor's customers interfered with its sales to existing and

future customers.  170 F. App'x at 808-07.  Upon a motion to dismiss, the district court

ruled that at the relevant time no distributorship agreement existed between the parties,

so the distributor had no breach-of-contract claim.  *Id.* at 807.  The district court dismissed

the tortious interference claims on the basis of the gist of the action doctrine because

these claims were based on violations of the alleged agreement.  *Chemtech Int'l, Inc. v.

Chemical Injection Technologies, Inc.*, No. 05-CV-140, 2005 WL 839404, at * 4 (E.D. Pa.

April 12, 2005).  On appeal, the Third Circuit affirmed both rulings.

As in *Chemtech*, LightStyles based its tortious interference claim on

violations of an alleged distribution agreement with Marvin.  We conclude that the claim is

barred by the gist of the action doctrine.[15]

Our resolution of the parties' arguments means there is nothing to try in

_____

[15]  In connection with its claim for breach of fiduciary duty, LightStyles argued that the gist of the action doctrine should not be applied to oral agreements.  We disagree.  First, LightStyles cites no authority in support of the argument and even admits that the doctrine was applied in *Alpart* to an oral agreement, albeit LightStyles attempted to distinguish *Alpart* because there was a writing in that case that listed the terms of the oral agreement.  Second, given the purpose of the doctrine, to maintain the distinction between a tort claim and a claim for breach of contact, *Bruno*, 106 A.3d at 68, we see no need for a distinction between an  oral contract and a written one.

regard to LightStyles' claims.  We will therefore enter summary judgment in favor of

Marvin and against LightStyles on all claims.

<u>/s/William W. Caldwell</u>
William W. Caldwell
United States District Judge

July 6, 2015